Vera ANALLA, Petitioner,

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES,**
Respondent.

No. 99–609V.

United States Court of Federal Claims.

Filed Under Seal: March 8, 2006[1].

Reissued: March 23, 2006.

Ronald Craig Homer, Conway, Homer & Chin–Caplan, P.C., Boston, MA, for Petitioner.

Melonie J. McCall, with whom were Peter D. Keisler, Assistant Attorney General, Timothy P. Garren, Director, Vincent J. Matanoski, Acting Deputy Director, and Catherine E. Reeves, Acting Assistant Director, United States Department of Justice, Torts Branch, Civil Division, Washington, DC, for Respondent.

## OPINION AND ORDER

WHEELER, Judge.[2]

### Introduction

This case is before the Court for review of the Chief Special Master's June 15, 2004 decision, as amended on October 22, 2004, denying Vera Analla's Petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa–1 *et seq.* (the "Vaccine Act"). At issue is whether Ms. Analla is entitled to compensation under the Vaccine Act for rheumatoid arthritis injuries allegedly caused by a Hepatitis B vaccination administered to her in October 1989.

The Petitioner asserts that the Chief Special Master's decision was arbitrary, constituted an abuse of discretion, and was not in accordance with law. *See* 42 U.S.C. § 300aa–12(e)(2)(B). Her three objections are that the Chief Special Master: (1) used an improper evidentiary standard from *Stevens v. Sec'y of Health and Human Services,* 2001 WL 387418 (Fed.Cl.Spec.Mstr. Mar. 30, 2001); (2) failed to consider adequately the opinions of Ms. Analla's treating physicians; and (3) failed to consider relevant Vaccine

---

1. Pursuant to the Rule 18(b) of the Court's Vaccine Rules, each party is afforded 14 days from the date of filing to object to the public disclosure of any information furnished by that party. Neither party having filed such an objection, the Court today publishes this Opinion and Order without redaction.

2. This case was transferred to Judge Thomas C. Wheeler on December 5, 2005, pursuant to Rule 40.1(b) of the Rules of the Court of Federal Claims.

Adverse Event Reporting System ("VAERS") reports.[3]

For the reasons discussed below, the Court affirms the Chief Special Master's decision. While the Court rejects the five-prong burden of proof analysis from *Stevens,* the Court nevertheless finds that Petitioner has failed to establish causation in this case, based upon the burden of proof guidelines from the Vaccine Act and binding precedent. *See, e.g., Althen v. Sec'y of Health and Human Services,* 418 F.3d 1274 (Fed.Cir.2005); *Shyface v. Sec'y of Health and Human Services,* 165 F.3d 1344 (Fed.Cir.1999); *Knudsen v. Sec'y of Health and Human Services,* 35 F.3d 543 (Fed.Cir.1994).

### Factual Background [4]

Vera Analla was born on April 7, 1949. According to her April 18, 2000 affidavit, Ms. Analla enjoyed an active, healthy life until 1989. (Petitioner's Exhibit 1 at 1 [hereinafter "Pet. Exh."]). Among her favorite activities were jogging, dancing, bowling, and playing darts. *Id.* Typically, she went to exercise classes three times per week. *Id.* She stated in her affidavit that she had never been hospitalized except when she delivered her three children. *Id.* She suffered occasionally from migraine headaches and colds. *Id.*

Ms. Analla graduated from nursing school in 1982, and then began working at a hospital. *Id.* Initially, she worked on the medical surgical floor for six months, and then in "post-partum" for three years. *Id.* For the next ten years, she worked in the Operating Room, and in Labor and Delivery. *Id.* The doctors in Labor and Delivery convinced Ms. Analla to receive the Hepatitis B series of inoculations. *Id.*

Beginning in August 1989, before any of her Hepatitis B shots, Ms. Analla experienced right carpal tunnel syndrome, which her doctor relieved by performing a right carpal tunnel "release"[5] in November 1989. (Pet. Exh. 4 at 17). Ms. Analla does not have a family history of rheumatoid arthritis ("RA"), though her mother suffered from Systemic Lupus Erythematosus ("SLE"),[6] a disease also characterized by joint stiffness. *Id.*

On September 8, 1989, Ms. Analla received her first Hepatitis B vaccination. (Pet. Exh. 3 at 1). She did not experience any adverse reactions to this shot. (Pet. Exh. 1 at 2). She received her second vaccination on October 12, 1989. (Pet. Exh. 3 at 1). After the second vaccination, Ms. Analla reported that "[t]he next day, [her] joints began to feel stiff and by Friday night, October 13, 1989, [her] hands were frozen in a half open position." (Pet. Exh. 1 at 2). From that point on, Ms. Analla asserted that her pain worsened. *Id.* She could not sleep through the night because of stiff joints, and recalled that she typically was up every two hours "walking around the house trying to loosen them up." *Id.* Ms. Analla refused the third Hepatitis B vaccination "due to increased arthritic activity." (Pet. Exh. 3 at 1).

Ms. Analla's stiff joints and hands began to affect her ability to work. (Pet. Exh. 1 at 2). She called in sick because her hands would "freeze up and [she] couldn't use them." *Id.* She stopped dancing, bowling, playing darts, and jogging. *Id.* She was "so tired and in so much pain" that she would go to bed as soon as she got home from work. *Id.*

---

3. VAERS is a database maintained by the Center for Disease Control ("CDC") to compile information from reports about reactions to immunizations listed on the Vaccine Injury Table, 42 U.S.C. § 300aa–14(a). Much of the reporting to CDC is voluntary, as only health care providers are required to report reactions to vaccinations. Additional detail about VAERS is provided in *Manville v. Sec'y of HHS,* 63 Fed.Cl. 482, 483 (2004); *see also Ryman v. Sec'y of HHS,* 65 Fed.Cl. 35, 39–40, 43 (2005).

4. The facts herein are as found by Chief Special Master Gary J. Golkiewicz, and confirmed by the Court's independent examination of the record.

5. A "release" is a "surgical incision or cutting of soft tissue to bring about relaxation." Dorland's *Illustrated Medical Dictionary* 1611 (30th Ed.2003) [hereinafter "Dorland's"].

6. "SLE" is a chronic, remitting, relapsing, inflammatory disorder of connective tissue thought to represent a failure of regulatory mechanisms of the autoimmune system and marked by wide abnormalities, including arthritis and arthralgias. Dorland's at 1072.

Ms. Analla visited her physician, Dr. Donald Binz, on March 6, 1990, almost five months after her second Hepatitis B vaccination. (Pet. Exh. 2 at 1). Dr. Binz's examination notes state that Ms. Analla complained of "swollen and painful joints." *Id.* During a follow-up visit on March 20, 1990, Dr. Binz noted a "6 week [history] of arthralgias," *id.* at 2, placing the onset of the joint stiffness in early February 1990.

On April 26, 1990, Ms. Analla visited a rheumatologist, Dr. Ronald Wepprich. (Pet. Exh. 4 at 1). During that visit, Dr. Wepprich recorded Ms. Analla's complaints of "multiple joint discomfort" that had existed for "14 months." *Id.* These notations thus date the onset of Ms. Analla's joint pains sometime in January 1989.[7] In an April 26, 1990 letter to Dr. Binz, Dr. Wepprich stated that Ms. Analla "had been well prior to onset of polyarthritis" in January 1990. *Id.* at 17. Dr. Wepprich also noted that Ms. Analla "had difficulties beginning in August 1989, with right carpal tunnel syndrome." *Id.* He concluded that Ms. Analla "has polyarthritis, which is certainly inflammatory in nature," and that "her present picture looks most consistent with rheumatoid arthritis." *Id.* at 18. Ms. Analla continued to visit Dr. Wepprich regularly until September 1994. *Id.* at 15.

On October 7, 1994, Ms. Analla was admitted to a hospital complaining of "numbness in her right side and leg," "some right-sided weakness," and difficulty walking. (Pet. Exh. 11 at 5). She was diagnosed with a "left-sided cerebrovascular accident with mild right hemiparesis and sensory deficit," commonly referred to as a stroke. *Id.* at 6. The hospital also diagnosed her with arthritis before discharging her on October 10, 1994. *Id.* at 7. A short time later, on January 25, 1995, Ms. Analla was admitted to a hospital again, this time reporting "chest pain." (Pet.

Exh. 6 at 20). After performing a cardiac catheterization, the hospital discharged Ms. Analla on January 29, 1995. *Id.* at 24–26.

On June 20, 1997, Ms. Analla again had "release" surgery, this time for left carpal tunnel syndrome. (Pet. Exh. 9 at 1–2). The record contains other medical evidence from the physicians who treated Ms. Analla during 1997–2003, all generally confirming that she suffers from RA. (*See, e.g.*, Pet. Exh. 8, 10, 22, 23).

### Procedural History

At the time of Ms. Analla's vaccination in 1989, the Hepatitis B vaccine was not included in the Vaccine Program. Effective August 6, 1997, however, Hepatitis B was added to the Vaccine Table. 42 U.S.C. § 300aa–14 (as amended); 42 CFR § 100.3 (2005). Ms. Analla filed her petition for compensation on August 4, 1999, alleging that the Hepatitis B vaccination administered to her 10 years earlier caused her RA.[8]

Initially, this Court received 22 cases from petitioners alleging that a Hepatitis B vaccination caused RA. From these 22, the attorneys representing the petitioners selected five to serve as "test" cases. The test cases were joined for a consolidated hearing before the Chief Special Master on the general issue of whether the Hepatitis B vaccine can in fact cause RA. The joint hearing also encompassed separate consideration of causation for each petitioner. In addition to the present case, the other test cases were: *Ashby v. HHS*, No. 01–221V; *Capizzano v. HHS*, No. 00–759V; *Ryman v. HHS*, No. 99–591V; and *Manville v. HHS*, No. 99–628V.

At the two-day hearing on June 11–12, 2003[9], the Chief Special Master first received testimony from four expert witnesses on the general question of whether the Hepatitis B vaccine can cause RA. (Tr. 7–250).

7. Ms. Analla attempted to locate the medical records of a Dr. Tejeio, a physician who treated her "for colds and flu" from 1978 through 1989. (Pet.Exh. 13). However, Dr. Tejeio retired sometime after 1989, and Ms. Analla was unable to locate him, or his medical records. *Id.*

8. Under the Vaccine Act, a petition may be filed not later than two years after the effective date of the revision, but the vaccine-related injury must

not have occurred more than eight years before the date of the table revision. 42 U.S.C. § 300aa–16(b). Ms. Analla's petition and alleged injuries were timely under both criteria.

9. References to the transcript from the June 11–12, 2003 hearing will be noted herein as "Tr. —."

On the second day, the Chief Special Master received specific causation evidence in each individual case. (Tr. 255–436). The expert witness for the petitioners was Dr. David Bell of the St. Joseph's Health Center, London, Ontario, Canada. Dr. Bell is a rheumatologist and has published articles about RA. (Tr. 7–9). The Respondent's expert witnesses were: Dr. Burton Zweiman, an immunologist and Professor of Medicine at the University of Pennsylvania (Tr. 158); Dr. Paul A. Phillips, division head of rheumatology at the University of New York, Upstate Medical University, Syracuse, New York (Tr. 211–212); and Dr. Lawrence Moulton, an Associate Professor at the Bloomberg School of Public Health, Johns Hopkins University. (Tr. 98–99).

The Chief Special Master's analysis and ultimate conclusion that the Hepatitis B vaccine can cause RA are found in *Capizzano v. Sec'y of Health and Human Services*, 2004 WL 1399178 (Fed.Cl. June 8, 2004). He accepted Dr. Bell's expert testimony that, in persons who experience RA from Hepatitis B vaccinations, the onset of RA can be expected within one to five weeks. (Tr. 21). However, in separate decisions in the test cases, the Chief Special Master denied compensation because the individual petitioners failed to establish causation-in-fact linking the Hepatitis B vaccine to the RA. *Capizzano*, 2004 WL 1399178; *Ryman v. Sec'y of Health and Human Services*, No. 99–591V (Fed.Cl. Spec.Mstr. Sept. 24, 2004) (unpubl.); *Manville v. Sec'y of Health and Human Services*, No. 99–628V (Fed.Cl.Spec.Mstr. July 9, 2004) (unpubl.); *Analla v. Sec'y of Health and Human Services*, No. 99–609V (Fed. Cl. Spec. Mstr. June 15, 2004) (unpubl.), remanded *sua sponte*, with instructions (Fed.Cl. Sept. 13, 2004) (unpubl.), order on remand (Fed.Cl.Spec.Mstr. Oct. 22, 2004). In *Ashby*, the Court dismissed the petition before reaching the merits.

In the 3–1/2 page *Analla* decision issued June 15, 2004, the Chief Special Master denied Ms. Analla's petition for compensation. Following Petitioner's Request for Review by this Court, Judge Marian Blank Horn *sua sponte* issued a Remand Order requiring the Chief Special Master to document the factual basis for his decision in greater detail. (Order, Sept. 13, 2004). The Chief Special Master issued an amended decision with greater factual detail on October 22, 2004. Due apparently to clerical oversight, Judge Horn did not receive the Chief Special Master's amended decision until September 8, 2005. At that point, Judge Horn requested the parties to file revised briefs addressing the appellate decision in *Althen*, 418 F.3d 1274. Both parties submitted supplemental briefing in compliance with Judge Horn's request.

Three of the other test cases have been the subject of decisions on review in this Court. *Capizzano v. Sec'y of Health and Human Services*, 63 Fed.Cl. 227 (2004) (Merow, J.); *Manville v. Sec'y of Health and Human Services*, 63 Fed.Cl. 482 (2004) (C. Miller, J.); *Ryman v. Sec'y of Health and Human Services*, 65 Fed.Cl. 35 (2005) (Wolski, J.). In each of those opinions, the assigned judge affirmed the Chief Special Master's decision.

### Discussion

█ This Court has jurisdiction under the Vaccine Act to review the Special Master's decision upon the timely request of either party. 42 U.S.C. § 300aa–12(e)(1)–(2). In reviewing the Special Master's decision, the Court is empowered to: (1) uphold the findings of fact and conclusions of law and sustain the decision; (2) set aside any findings of fact and conclusions of law "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ...."; or (3) "remand the petition to the special master for further action in accordance with the court's direction." 42 U.S.C. § 300aa–12(e)(2)(A)–(C); *Althen*, 418 at 1277–78. Thus, the Special Master's decision may be set aside only if the findings of fact are arbitrary and capricious, the legal conclusions are not in accordance with law, or the discretionary rulings constitute an abuse of discretion. *Turner v. Sec'y of Health and Human Services*, 268 F.3d 1334, 1337 (Fed. Cir.2001); *Munn v. Sec'y of Health and Human Services*, 970 F.2d 863, 870 n. 10 (Fed. Cir.1992).

█ Under the Vaccine Act, a petitioner may pursue compensation through one of two statutory avenues. First, a petitioner may

allege a "table injury." The Vaccine Act includes a Vaccine Injury Table identifying various injuries associated with specified vaccines which, if suffered within a specified time period after the vaccination, entitle the petitioner to a legal presumption that the vaccine caused the injuries. *See* 42 U.S.C. § 300aa–14(a). Once such a presumption attaches, the burden shifts to the Respondent to prove by a preponderance of the evidence that the injuries were caused by some other unrelated factor. The second route to recovery requires the petitioner to prove affirmatively a causal link between the vaccine and the alleged injuries. Therefore, if a petitioner cannot show a table injury, she may nevertheless receive compensation if she can prove by a preponderance of the evidence that her injuries were in fact caused by the vaccine. *See* 42 U.S.C. § 300aa–11(c)(1)(C)(ii)(I), –13(a)(1); *Althen,* 418 F.3d at 1278; *Munn,* 970 F.2d at 865. These claims are known as "off-table" injuries. Here, RA is not a table injury for the Hepatitis B vaccine, so Ms. Analla must proceed under the criteria for "off table" injuries.

The Chief Special Master developed a five-prong test that, if all requirements were met, would satisfy the preponderance of the evidence standard and entitle petitioners to compensation under the Vaccine Act. *Stevens v. Sec'y of Health and Human Services,* 2001 WL 387418 (Fed.Cl.Spec.Mstr. Mar. 30, 2001). He identified the prongs as: (1) proof of medical plausibility; (2) proof of confirmation of medical plausibility from the medical community and literature; (3) proof of an injury recognized by the medical plausibility evidence and literature; (4) proof of a medically acceptable temporal relationship between the vaccination and the onset of the alleged injury; and (5) proof of the elimination of other causes. *Id.* at *23–*26. While the Chief Special Master has applied these criteria in subsequent decisions, such as *Cap-*

*izzano,* 2004 WL 1399178, and has advised parties that they would be controlling in cases before him, he has also acknowledged "that the five criteria are not binding on other special masters in the Vaccine Program." *See Manville,* 63 Fed.Cl. at 488, (citing *Capizzano,* 2004 WL 1399178 at *4).

In analyzing the expert testimony and record evidence in the test cases where the Hepatitis B vaccine is alleged to have caused RA, the Chief Special Master divided the causation inquiry in the following way: (A) *Can* the Hepatitis B vaccine cause RA; and (B) *Did* the Hepatitis B vaccine cause RA in the petitioner? *See Analla,* (Fed.Cl. Spec.Mstr. Oct. 22, 2004) (order on remand) at 6–7, (citing *Capizzano,* 2004 WL 1399178 at *9–*13). After finding that the Hepatitis B vaccine *can* cause RA, the Chief Special Master then considered the following additional causation criteria on the issue of whether the Hepatitis B vaccine *did* cause RA in the petitioner: (1) whether there were any epidemiological studies showing a relative risk greater than two establishing a causal link between a vaccine and an injury;[10] (2) whether there was evidence that a "rechallenge event"[11] had occurred, thereby establishing a biologic plausibility that the Hepatitis B vaccine caused the RA; (3) whether the petitioner had any "pathological markers" or "genetic propensity" demonstrating an association between the Hepatitis B vaccine and RA; (4) whether there is evidence of general acceptance within the scientific or medical communities that the Hepatitis B vaccine causes RA; and (5) whether there is evidence of a link between the biologic mechanisms identified by the petitioners' expert, Dr. Bell, and the occurrence of RA in Ms. Analla. *Analla,* (Fed.Cl. Spec.Mstr. Oct. 22, 2004) at 7–9.

In *Althen,* a July 2005 appellate decision issued after the Chief Special Master's deci-

---

**10.** "Epidemiology" is "the science concerned with the study of the factors determining and influencing the frequency and distribution of disease, injury, and other health-related events and their causes in a defined human population for the purpose of establishing programs to prevent and control their development and spread." Dorland's at 626. "Relative risk" is the "ratio of the incidence rate among individuals with a giv-

en risk factor to the incidence rate among those without it." *Id.* at 1638.

**11.** A "rechallenge event" is where adverse symptoms are noted after a dose of the vaccine, an additional dose of the vaccine is given, and the symptoms worsen. *See Ryman,* 65 Fed.Cl. at 39 n. 6.

sion and amended decision in this case, the Federal Circuit considered the propriety of the Chief Special Master's burden of proof standards in *Stevens*. The Federal Circuit determined that the *Stevens* test imposed a greater burden on the petitioner than is required by the Vaccine Act, particularly in prong two, where *Stevens* demanded proof of "confirmation of medical plausibility from the medical community and literature." *Althen*, 418 F.3d at 1279–80 (citing *Stevens*, 2001 WL 387418 at \*23–\*26). The Federal Circuit observed that, by requiring evidence of medical literature, the *Stevens* test "prevents the use of circumstantial evidence envisioned by the preponderance standard and negates the system created by Congress, in which close calls are resolved in favor of injured claimants." *Althen*, 418 F.3d at 1280 (citing *Knudsen*, 35 F.3d at 549). The Federal Circuit also observed that "the purpose of the Vaccine Act's preponderance standard is to allow the finding of causation in a field bereft of complete and direct proof of how vaccines affect the human body." *Id.* The Court concluded that the Special Master's application of the *Stevens* test was contrary to law, noting that "[t]he special master's role is to assist the courts by judging the merits of individual claims on a case-by-case basis, not to craft a new legal standard to be used in causation-in-fact cases." *Id.* at 1281. Of the five-prong *Stevens* test, the Court ultimately rejected prongs two and three, and held that the remainder of the test was "merely a recitation of this court's well-established precedent." *Id.*

In accordance with *Althen*, the Court cannot accept the Chief Special Master's application of the *Stevens* test in this case. Similarly, the Chief Special Master's listing of the five types of evidence that might establish whether the Hepatitis B vaccine *did* cause Ms. Analla's RA may have sought evidence that does not exist. While certainly any petitioner who could satisfy one or more of these criteria would probably prevail, it is too restrictive to say that meeting these criteria is the *only* way to prevail. The observation that Ms. Analla failed to present epidemiological studies, rechallenge events, or pathological markers, while true, likely could not be met by any petitioner seeking to show

that a Hepatitis B vaccine caused RA. However well-intentioned, the Chief Special Master's use of difficult or impossible medical benchmarks departs from the Vaccine Act's intent that "close calls are resolved in favor of injured claimants." *Althen*, 418 F.3d at 1280. The proper burden of proof requirements are stated in the Vaccine Act, 42 U.S.C. § 300aa–13, and in such cases as *Althen*, 418 F.3d 1274; *Shyface v. Sec'y of Health and Human Services*, 165 F.3d 1344 (Fed.Cir.1999); and *Knudsen v. Sec'y of Health and Human Services*, 35 F.3d 543 (Fed.Cir.1994), among others.

Notwithstanding the misapplication of the preponderant evidence standard, however, the record does not support a finding that Ms. Analla is entitled to recover. There is no question that Ms. Analla suffers from RA, but the record is not clear on when her RA began, and there is no persuasive evidence that the Hepatitis B vaccine caused her RA. Indeed, Ms. Analla experienced right carpal tunnel syndrome with some swelling in August 1989, prior to her first Hepatitis B shot. (Pet. Exh. 4 at 17; Tr. 376). Ms. Analla did not visit her doctor after the second Hepatitis B vaccination until March 6, 1990, almost five months after receiving the shot. (Pet. Exh. 2 at 1). Thus, March 6, 1990 marks the first objective medical finding of joint pains following the vaccination. (Tr. 376).

The record also contains contradictory information concerning the history of Ms. Analla's joint pains. On March 20, 1990, Dr. Binz recorded Ms. Analla's six-week history of arthralgias (Pet. Exh. 2 at 2), placing the onset of joint pain in early February 1990. When Ms. Analla visited a rheumatologist, Dr. Wepprich, on April 26, 1990, he recorded a 14–month history of "multiple joint discomfort." (Pet. Exh. 4 at 1). This notation places the onset of Ms. Analla's joint pains in January 1989, well before the October 12, 1989 Hepatitis B vaccination. In an April 26, 1990 letter to Dr. Binz, however, Dr. Wepprich stated that Ms. Analla "had been well prior to onset of polyarthritis" in January 1990. *Id.* at 17. In further conflict with these medical records is Ms. Analla's April 18, 2000 affidavit, maintaining that the onset of the severe joint pains occurred the day

after the October 12, 1989 Hepatitis B vaccination. (Pet. Exh. 1 at 2). The 1978–1989 records of Dr. Tejeio may have been probative of when Ms. Analla's joint pains actually began, but these documents are unavailable and not part of the evidence. (Pet.Exh. 13).

Petitioner's expert, Dr. Bell, testified that, in a person who experiences RA due to a Hepatitis B vaccination, the onset of RA symptoms should occur within one to five weeks after the shot. (Tr. 21). The Chief Special Master accepted that evidence both in *Capizzano* and in the amended *Analla* decision. *See Capizzano*, 2004 WL 1399178 at * 17; *Analla* (Fed.Cl.Spec.Mstr. Oct. 22, 2004) at 6. Yet Ms. Analla did not visit a medical doctor within the one-to-five week period after her Hepatitis B vaccination. None of the medical records in evidence places the onset of Ms. Analla's RA within the one-to-five week period—all of them state that the onset occurred either well before or well after the period when RA from Hepatitis B would be expected to manifest. On the evidence presented, the Court cannot say with any certainty when Ms. Analla's joint pains began.

Even if the Court were to acknowledge some temporal relationship between Ms. Analla's second Hepatitis B vaccination and the onset of RA, none of the contemporaneous medical records assert any connection between the vaccine and the RA. As Senior Judge Merow observed in *Capizzano*, "[g]iven the number of persons receiving hepatitis B vaccine and the percentage of the population developing RA, there are bound to be persons receiving the vaccine who would, in any event, develop RA." *Capizzano*, 63 Fed. Cl. at 230. Contrary to Petitioner's assertions, the Chief Special Master did consider the opinions of Ms. Analla's treating physicians, and found them wanting. (Order on Remand, at 3–5). The records of the treating physicians establish only that Ms. Analla has RA, a fact that is not in dispute.

Finally, Petitioner's challenge that the Chief Special Master failed to consider relevant VAERS reports is without merit. The Court uniformly has upheld the Chief Special Master's concerns about the reliability of VAERS data. *Capizzano*, 63 Fed.Cl. at 231

(VAERS data has limited value due to the manner in which it is collected, the lack of confirmation of the reported information, and the lack of any systemic analysis); *Manville*, 63 Fed.Cl. at 494 (VAERS reports can be filed by anyone, thus raising questions about the quantity and quality of the information gathered); *Ryman*, 65 Fed.Cl. at 40, 43 (VAERS reports may be biased toward preexisting notions of adverse events). The testimony of Respondent's expert, Dr. Moulton, confirms that the VAERS reports "offer very little information regarding causality." (Tr. 119). The Chief Special Master's treatment of VAERS evidence was proper and reasonable.

### Conclusion

Based upon the foregoing, the Court upholds the Chief Special Master's decision, as amended by the October 22, 2004 Order on Remand. Even though the Chief Special Master applied an improper burden of proof analysis stemming from *Stevens*, 2001 WL 387418, which the Federal Circuit rejected in *Althen*, this misstep amounts to harmless error here. *See* RCFC 61. The facts presented do not support any recovery for Ms. Analla under a proper application of the preponderance of the evidence test. Accordingly, the Chief Special Master's decision is affirmed. The Petition for Review is dismissed with prejudice. The Clerk of the Court is directed to enter judgment for Respondent.

**IT IS SO ORDERED.**