NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

———————————

**ROBERTO C. GONZALEZ,**
*Petitioner*

**v.**

**DEPARTMENT OF EDUCATION,**
*Respondent*

———————————

2023-2001

———————————

Petition for review of the Merit Systems Protection Board in No. SF-0752-15-0541-I-1.

———————————

Decided: March 14, 2025

———————————

LAWRENCE BERGER, Mahon & Berger, Esqs., Glen Cove, NY, argued for petitioner.

TANYA KOENIG, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by REGINALD THOMAS BLADES, JR., BRIAN M. BOYNTON, PATRICIA M. MCCARTHY.

———————————

Before STOLL, CLEVENGER, and CUNNINGHAM, *Circuit Judges.*

CLEVENGER, *Circuit Judge.*

Roberto C. Gonzalez petitions for review of the Final Order of the Merit Systems Protection Board ("Board") sustaining his removal from federal service by the United States Department of Education ("agency"), effective April 10, 2015. *Gonzalez v. Dep't of Educ.*, Docket No. SF-0752-15-0541-I-1 (April 19, 2023). Before his removal, Mr. Gonzalez served as Criminal Investigator (Special Agent) GS-1811-13 in Department of Education's Office of Inspector General, Long Beach Regional Office, ("OIG") in Long Beach, California. For reasons set forth below, we affirm the Board's Final Order.

I

This case stems from a dispute that arose on January 25, 2014, at the Gonzalez family residence in the city of Cerritos, California, located near Long Beach in Los Angeles County. That afternoon, Mr. Gonzalez and his wife celebrated their daughter's fifth birthday at a local park. The celebration continued at the family home, with family members and a friend present. Later in the evening, Mr. Gonzalez's 16 year old stepdaughter was tasked with cleaning the dishes left from the party. Mrs. Gonzalez, the mother of the 16 year old, argued heatedly with her daughter over the correct way to wash dishes. Mr. Gonzalez joined the argument, which increased in intensity, and Mrs. Gonzalez sought to de-escalate the argument by physically intervening between Mr. Gonzalez and his stepdaughter. After some physical grappling, the stepdaughter fled from the home, and Mr. Gonzalez's 12 year old son ran after her.[1] Unable to find the stepdaughter, the son made

---

[1] Mr. Gonzalez also left the home, leaving some children unattended. He claims to have done so for the

a 911 telephone call from a liquor store about a mile from the family home, telling the 911 dispatcher "[t]here's been a fight at my house and . . . [I] ran away because my father was punching my sister. . . . I was tackling my dad, I tried to stop him, but he kept punching her, and me and my sister just ran away." J.A. 10.

Responding to the 911 call, the Los Angeles Sheriff's Department ("LASD") promptly sent a Sheriff's Deputy to the Gonzalez home to investigate the young son's allegations. After conducting preliminary interviews, the LASD arrested Mr. Gonzalez on January 29, 2014, initially charging him with (1) Willful Cruelty to a Child, (2) Spousal Battery, and (3) Child Abandonment. The Los Angeles County District Attorney's Office filed a criminal complaint against Mr. Gonzalez on March 18, 2014, formally charging him with (1) one count of Cruelty to a Child by Inflicting Injury, and (2) one count of Battery. On April 17, 2014, Mr. Gonzalez, represented by counsel, pleaded not guilty before Judge Deborah Sanchez. After a discussion with Mr. Gonzalez's attorney, Judge Sanchez issued a protective order that restrained Mr. Gonzalez from contacting his wife and stepdaughter.

At the April 17 pleading hearing, Mr. Gonzalez's attorney informed Judge Sanchez that Mr. and Mrs. Gonzalez had been receiving professional and religious counseling since February, and that the standard physical "stay away" distance of 100 yards in a typical protective order would be counterproductive to this. Judge Sanchez agreed that continued counseling was a "good move," and stated she would amend the standard protective order to permit Mr. and Mrs. Gonzalez to continue marriage counseling at the Cerritos Psychological Center and spiritual guidance at Park

---

purpose of locating his son. He did not return to the home until the next day.

Crest Church. Hr'g Tr. at 6, *People v. Gonzalez*, Docket No. 4BF01379 (CA Sup. Ct. Apr. 17, 2014).

Judge Sanchez then read aloud the other terms of the protective order, including that Mr. Gonzalez (a) "must have no personal, electronic, telephonic or written contact with the protected persons" ("item 10"), (b) "must have no contact with the protected persons . . . through a third party," except through counsel ("item 11"), and (c) "must not come within 100 yards of the protected persons" ("item 12"). J.A. 759; *see* Hr'g Tr. at 7-8, *People v. Gonzalez*, Docket No. 4BF01379 (CA Sup. Ct. Apr. 17, 2014). Both Mrs. Gonzalez and her daughter were named as the protected persons. Other than to have the protective order allow personal contact between Mr. Gonzalez and Mrs. Gonzalez at their two weekly counseling sessions, Mr. Gonzalez's lawyer did not request any further deviation from the terms of the order.

Accordingly, Judge Sanchez modified the standard protective order to allow exceptions for items 10, 11, and 12 of the order to permit Mr. Gonzalez to attend counseling with Mrs. Gonzalez at the Cerritos Psychological Center and the Park Crest Church. As modified, (1) item 10 would allow otherwise barred personal and electronic contact with Mrs. Gonzalez at the locations of marital and spiritual counseling, (2) item 11 would allow otherwise barred contact with Mrs. Gonzalez through a third party (other than an attorney of record), allowing contact through others involved in counseling, and (3) item 12 would permit Mr. Gonzalez to come within 100 yards of Mrs. Gonzalez at the counseling sessions.

Mr. Gonzalez and his attorney returned to Judge Sanchez's court on April 21, 2014, to prove the location of Mr. Gonzalez's government-issued firearm. After explaining that the firearm was in the government's possession, Mr. Gonzalez's attorney asked Judge Sanchez for a further modification of the protective order. His attorney

explained that because Mrs. Gonzalez worked full-time and Mr. Gonzalez was responsible for picking up their five-year old daughter from school and returning her home, the 100 yard stay away distance from Mrs. Gonzalez should be modified to 100 feet.  This would permit Mr. Gonzalez to release the child in front of their house, instead of much further away from where Mrs. Gonzalez would be able to safely receive the child.  Judge Sanchez agreed that the further revision to the protective order was appropriate, and accordingly modified item 12 to permit Mr. Gonzalez to come within 100 feet of Mrs. Gonzalez when he is bringing the five-year old child home from school.

At the brief hearing on April 21, Mr. Gonzalez's counsel sought no further amendments to the protective order.  No reference was made to any need for the couple to communicate by telephone or text message on matters relating to their marriage and spiritual counseling, or on details relating to school pick up and drop off arrangements.  The absolute bar of telephone, written, and electronic contact was left in force (except for when the couple was at counseling).

After April 21, the LASD made several attempts to continue its investigation within the time set for trial, but experienced complications surrounding the service of subpoenas on key witnesses and scheduling delays arising from Mrs. Gonzalez's employment-related commitments.  On August 25, 2014, the prosecution announced that due to these issues, it was unable to proceed, and the court dismissed both charges and dissolved the protective order.  However, the LASD made clear the dropping of the charges against Gonzalez "did not necessarily reflect the state of the evidence." J.A. 107.

The agency's Quality and Integrity Group ("QIG") promptly opened an administrative investigation into the domestic incident that led to the criminal charges.  In particular, QIG investigated whether Mr. Gonzalez assaulted his stepdaughter and wife, left the scene of the incident in

a vehicle under the influence of alcohol, left minor children unattended, and violated the court-issued protective order.

QIG named Special Agent Carrie Jackson ("SA Jackson"), who was assigned to the headquarters operations office, as lead investigator for the investigation. Other than Mr. Gonzalez, QIG was unable to interview any witnesses to the January 25, 2014, domestic incident, including Mrs. Gonzalez, because they refused to talk to QIG. Also, QIG was unable to interview minor witnesses without adult consent, due to agency policy. However, QIG did interview the responding LASD officers and others who might have had pertinent information. QIG also obtained Mr. Gonzalez's telephone records from T-Mobile. The telephone records revealed that while the protective order was in effect, there were 5,025 communications (a combination of telephone and text messages) between Mr. Gonzalez and Mrs. Gonzalez, 3,296 of which originated from Mr. Gonzalez. Curious to know whether the volume of unpermitted calls and texts would drop dramatically, SA Jackson removed communications within timeframes incidental to Judge Sanchez's modifications to the protective order. SA Jackson deducted all communications between Mr. and Mrs. Gonzalez during counseling on Wednesdays (marital counseling) and Sundays (religious counseling) and between 4 and 6 p.m. on weekdays (approximate time of drop off of the five-year-old child) from the total 5,025. That analysis revealed that 3,201 calls and texts remained. Removing the 1,729 calls and texts that originated from Mrs. Gonzalez's phone left 1,472 communications between Mr. and Mrs. Gonzalez.

Mr. Gonzalez was forthright in telling QIG that he had frequent communications with his wife, all of which he believed were related to family matters, and thus not barred by the protective order. His belief was grounded in his understanding that the exceptions for contact granted by Judge Sanchez for when he was in marriage or religious counseling and when he was dropping the five-year-old

daughter off at home during weekday afternoons gave him permission to communicate by telephone or text message with his wife about their marriage counseling and care for their young child.  Mr. Gonzalez believed that all 5,025 of the communications with his wife were not in violation of the protective order.

QIG's Report of Investigation ("Report"), dated December 18, 2014, concluded that Mr. Gonzalez had assaulted his stepdaughter, drove away from the scene under the influence of alcohol leaving minor children unattended, violated the court-imposed protective order by regularly communicating with his wife, and interfered with LASD's and QIG's investigations.  The Report opined that Mr. Gonzalez's transgressions do not comport with the standards for character set by the Council of the Inspectors General ("CIG"), which require investigators to possess and maintain the highest standards of conduct and ethics.  The Report particularly noted that Mr. Gonzalez's failure to comply with the court-imposed protective order was a failure to comply with legal requirements, which is also a requirement of the CIG standards.

On January 23, 2015, David Aspling, Mr. Gonzalez's first line supervisor, issued the agency's Notice of Proposal to Remove Mr. Gonzalez based on the findings and conclusions of the Report.  The proposed removal made three charges against Mr. Gonzalez: Conduct Unbecoming a Federal Law Enforcement Officer ("Conduct Unbecoming"), with five specifications of misconduct, Lack of Candor, with three specifications of misconduct, and Failure to Follow Instructions, based on one specification of misconduct.

The first specification on the Conduct Unbecoming charge stated that Mr. Gonzalez grabbed his stepdaughter's hair and struck her.  Specification two stated that Mr. Gonzalez left his house on the night of the incident and did not return because he was fearful the police would apprehend him.  Specification three stated that there were 5,025

records of communication between Mr. and Mrs. Gonzalez in violation of the protective order. The specification noted that 3,296 of the communications were initiated by Mr. Gonzalez, and that Mr. Gonzalez violated the protective order 3,201 times even if the communications during the counseling and drop-off times were excluded. Specification four stated that Mr. Gonzalez interfered with the QIG investigation through his actions in connection with QIG's service of a subpoena on the Gonzalez's landlord. Specification five stated that Mr. Gonzalez wrongly certified on a lease application that Special Agent Ivan Anthony was his supervisor, when in fact Mr. Aspling was his supervisor.

Specification one on the Lack of Candor charge stated that Mr. Gonzalez was not forthright with QIG regarding the veracity of the police report for the January 25, 2014 incident. Mr. Gonzalez stated that "the only truthful parts of the police report were that there was an argument, [his] stepdaughter slapped [him], [he] ended up on the ground and the kids ran out the door." J.A. 113. For failing to credit the statements in the police report that he struck his stepdaughter and grabbed her hair, Mr. Gonzalez was charged with lack of candor. Specification two charged Mr. Gonzalez with lack of candor for having told QIG that there was an exception in the protective order that allowed regular contact with his wife on childcare and that he had complied with the protective order. The charge stated that "[t]here is no such exception written into the order and none of the transcripts from the court hearings contain a discussion of such an exception." J.A. 113. Specification three charged Mr. Gonzalez with lack of candor for having told QIG that he had to leave the residence where the incident occurred because he was on non-pay status with QIG, when in fact he had begun the process of moving before he was put on non-pay status.

The single specification for the charge of Failure to Follow Instructions stated that although Mr. Gonzalez had been instructed to notify Mr. Aspling of any changes in his

address, he failed to do so and thus failed to follow instructions.

Mr. Aspling's recommendation to remove Mr. Gonzalez then moved to the deciding official, Special Agent in Charge, Natalie Forbort ("SA Forbort"), Mr. Gonzalez's second line supervisor. In the Final Decision on the Proposal to Remove, SA Forbort agreed with the proposal on all but one specification across the three charges. As to specification three to the first charge, the violation of the protection order, SA Forbort made clear that the agency was charging Mr. Gonzalez with 5,025 records of communication between Mr. and Mrs. Gonzalez in violation of the protective order, not only the 3,201 communications also shown in the Report and mentioned in the Notice of Proposal to Remove. In response to Mr. Gonzalez's contention that the protective order permitted him to have unlimited contact with Mrs. Gonzalez about childcare and counseling, SA Forbort stated that the protective order was clear and unambiguous, that nothing said at the April 17 and 21, 2014, hearings before Judge Sanchez could have led Mr. Gonzalez to believe that the exception for continuing to attend marriage and spiritual counseling also permitted him to have regular communication with his wife about his children and their welfare. SA Forbort did not mention the number of calls that were initiated by Mrs. Gonzalez, nor did she refer to QIG's analysis which broke out communications relative to counseling and child drop-off to find 3,201 communications outside the counseling and drop-off time zones. SA Forbort did not suggest in any way that the agency interpreted the amendments to the protective order to allow anything more than unrestricted contact between the couple during counseling and a stay-away distance of 100 feet when Mr. Gonzalez was bringing his daughter home from school. Mr. Gonzalez was removed from his position on April 10, 2015.

The removal decision found there was a nexus between Mr. Gonzalez's charged misconduct and the efficiency of the service, and that removal was the appropriate penalty.

## II

Mr. Gonzalez timely appealed his removal to the Board. His case was assigned to Administrative Judge Grace B. Carter ("AJ"), who held a two-day hearing on August 26-27, 2015. Five witnesses appeared at the hearing: the LASD Deputy Sheriff who responded to the 911 call and went to the family residence; the LASD Detective who led the police investigation; SA Jackson; SA Forbort; and Mr. Gonzalez. After review of all the documentary evidence of record and considering the testimony given, the AJ issued her initial decision on each specification sustained in the agency's Final Decision. With regard to Mr. Gonzalez, the AJ made a specific favorable credibility determination, based on his demeanor, which the AJ found to be "calm, direct and forthright," as well as "open and candid." J.A. 8-9.

On specification one of the Conduct Unbecoming charge (grabbing the stepdaughter's hair and striking her), the AJ credited Mr. Gonzalez's testimony that he only grabbed his step-daughter's hair to steady her as she swung her arm at him and that he did not strike her. There were only two points of evidence that Mr. Gonzalez actually struck his stepdaughter: one came from Mr. Gonzalez's 12 year old son's 911 telephone call, and the second was hearsay testimony of Mr. Gonzalez's two other minor children offered by the incident-reporting officer, who the AJ found to be "unusually naïve" regarding his treatment of the children's statements. J.A. 12. The AJ found the agency's evidence on this specification to be, at best, in equipoise. As such, citing *Knudsen v. Department of Health & Human Services*, 35 F.3d 543, 550 (Fed. Cir. 1994), the AJ held the specification not sustained because the agency failed to carry its burden of proof. The AJ also found the second

specification (leaving the house and not returning for fear of apprehension by police) not sustained, because there was no evidence that Mr. Gonzalez knew of his son's 911 call at the time he left the house, and nothing more than innuendo and speculation suggested that Mr. Gonzalez fled his home and did not return to evade police.

The AJ further found the third specification of the Conduct Unbecoming charge not sustained. The AJ analyzed this specification by focusing on the part of the Report that examined Mr. Gonzalez's telephone records, noting initially that the records showed 5,025 telephone or cellular communications between Mr. and Mrs. Gonzalez in the April 22, 2014, to August 24, 2014, time-period when the protective order was in effect.

Because QIG's analysis showed that 1,729 of the 5,025 communications originated from Mrs. Gonzalez's cellphone, and Mrs. Gonzalez was not subject to the protective order, the AJ found that none of the 1,729[2] communications violated the protective order. Next, the AJ interpreted the QIG analysis to acknowledge that many of the remaining 3,296[3] communications would not necessarily violate the protective order, namely the communications that related to counseling and dropping off the infant daughter. Regarding the marriage and spiritual counseling, Mr. Gonzalez had testified that in connection with the Wednesday and Sunday counseling sessions, the counselors recommended "pretty much daily" communication, which could occur at different hours of the day, and which went on for months. J.A. 18. Mr. Gonzalez also had testified that he

---

[2] The AJ's initial decision lists the number of communications initiated by Mrs. Gonzales as 1,749 and the remaining number of communications as 3,256. However, as noted by the Board, this is either a typo or a calculation error.

[3] *See supra*, note 2.

was responsible for dropping off the couple's 5-year-old daughter between 4pm and 6pm from Mondays to Fridays. Because the child's preschool schedule varied considerably, as did Mrs. Gonzalez's return home from work times, the necessary coordination required the couple to constantly make arrangements. In his testimony, Mr. Gonzalez agreed that the protective order had no exception to allow communication so long as it related to his daughter, and that there was no need for telephonic communication with his wife when they were at the counseling centers. Even so, Mr. Gonzalez testified that communications about his daughter and communications about counseling made when the couple was not at the counseling centers were, in his view, not barred by the protective order. The AJ expressly found Mr. Gonzalez's live testimony about the need for frequent communication with his wife about counseling and childcare to be "sincere, without guile and internally consistent, consistent with the record and not inherently improbable." J.A. 18.

Treating the QIG analysis as showing agency agreement that communications relating to counseling and childcare were permissible under the protective order, the AJ observed that "it would seem difficult, if not impossible, for the agency to identify with any reasonable degree of certainty" which of the remaining 3,296[4] communications violated the protective order. J.A. 18. The AJ understood the QIG analysis to have attempted to identify which communications permissibly dealt with counseling and childcare and which did not. The QIG analysis identified 1,824 communications that occurred on Wednesdays and Sundays (the days of counseling) and between 4pm and 6pm on weekdays (approximate time of after school drop off). The AJ held this calculation to be arbitrary, as it necessarily excluded counseling and childcare communications that

---

[4]    *See supra,* note 2.

would be expected to occur outside the time periods the QIG analysis used to identify communications related to childcare and counseling. The AJ found the agency's attempt to conjure authorized versus unauthorized communications insufficient to meet the agency's burden to prove by preponderant evidence that Mr. Gonzalez violated the protective order and thereby engaged in Conduct Unbecoming a Federal Enforcement Officer.

On the fourth specification (interfering with the QIG investigation), the AJ found Mr. Gonzalez's version of the facts underlying the specification more credible than the version proposed by the agency, and therefore that the specification was not sustained. The fifth specification charged Mr. Gonzalez with signing a lease application that misstated the name of his supervisor. Mr. Gonzalez denied signing the lease. The evidence left unclear whether Mr. Gonzalez had prepared and signed the lease, and the signature on the lease bore almost no resemblance to Mr. Gonzalez's actual signature as shown on other record documents. The AJ concluded that Mr. Gonzalez did not prepare the lease and that the misstatement about the name of his supervisor was not made by Mr. Gonzalez. Accordingly, the AJ found this specification not sustained.

The AJ also found both the sustained specifications in the agency's Lack of Candor charge unproven and were thus not sustained. For the first specification, whether Mr. Gonzalez's answer to QIG's question about which parts of the police report were true, the AJ found "there [was] no evidence that [Mr. Gonzalez] was knowingly deceptive or . . . attempted to mislead or obscure the truth" from the QIG investigators. J.A. 26. Without such showings, a Lack of Candor charge cannot be established, and thus cannot be sustained. The second specification of the Lack of Candor charge accused Mr. Gonzalez of incorrectly stating to QIG that there were exceptions in the protective order for childcare and counseling, and stating that he had complied with the protective order. Given the AJ's interpretation of

the Report and protective order, the AJ found that the agency produced no evidence that Mr. Gonzalez knowingly gave incorrect or incomplete information to QIG about exceptions to the protective order and that he had complied with all the court's requirements.

The AJ however sustained the third charge, Failure to Follow Instructions. Mr. Gonzalez had a duty to report a change in residential address within a reasonable period. The AJ determined that a reasonable period would allow two weeks to report a change. Because Mr. Gonzalez never reported the change to his first line supervisor, and only revealed the fact of the change to the QIG investigator almost two months after the change, the AJ found the third charge was sustained.

With only one charge sustained of the three originally assessed, the AJ addressed the issue of an appropriate penalty. The AJ first found that Mr. Gonzalez's Failure to Follow Instructions affects the efficiency of the service, thus establishing a nexus between charge three and the efficiency of the service. Then the AJ noted SA Forbort's testimony that she would not have sustained the penalty of removal if only the Failure to Follow Instructions charge was sustained. Next the AJ noted that for the sole remaining charge sustained, the agency's table of penalties lists a 3 to 14 day suspension for a first offense. The AJ ordered the agency to cancel Mr. Gonzalez's removal and substitute in its place the penalty of a 14-day suspension. The AJ's Initial Decision issued on October 3, 2016.

### III

On November 4, 2016, the agency petitioned the Board for review of the AJ's initial decision. The agency challenged the findings of the AJ on the first three of the five specifications of the Conduct Unbecoming charge and on the second specification of the Lack of Candor charge. Under Conduct Unbecoming specification three, the agency continued to argue that the plain language of the protective

order and Judge Sanchez's comments at the April 17, 2014 hearing barred all electronic communications between the couple. The agency contended that none of Mr. Gonzalez's 5,025 communications were authorized.

Mr. Gonzalez's response to the agency's petition for review stated that "[u]nfortunately, the Court (and advocates) failed Mr. Gonzalez and [his wife] by not expressly providing a means of communicating with each other to alert each other as to when to pick up and drop the child off." Appellant's Resp. to Agency's Pet. for Rev. at 9-10, *U.S. Dep't of Educ. v. Gonzalez*, Docket No. SF-0752-15-0541-I-1 (M.S.P.B. Nov. 28, 2016). Even so, Mr. Gonzalez argued that there was an implicit exception for telephonic and electronic communications between the couple for child drop-off and counseling. Outside of communications relating to these exceptions, Mr. Gonzalez argued that "[he] did not otherwise violate the Order and dutifully adhered to its strictures." *Id.* Because of this, Mr. Gonzalez argued the AJ was correct to find this specification not sustained.

IV

The Board granted the agency's petition for review and issued its Final Order on April 19, 2023. The Board reversed the AJ's Initial Decision insofar as it did not sustain the AJ's findings on the third specification of the Conduct Unbecoming charge and thus the charge itself. The Board affirmed the Initial Decision insofar as it sustained the Failure to Follow Instructions charge. The Board vacated the AJ's penalty determination and reinstated the penalty of removal. As to the remaining specifications, the Board stated that, "because we have sustained specification 3 and the conduct unbecoming charge, we need not address the remaining specifications that the agency challenged on review." J.A. 54 n.7; *see also id.* at n.8 ("In light of our decision to sustain specification 3 of the conduct unbecoming a Federal law enforcement officer charge and the charge

16                                GONZALEZ v. EDUCATION

itself, we need not address the agency's arguments on review regarding specification 2 of the lack of candor charge.").

On the question of whether Mr. Gonzalez violated the protective order, the Board framed the question as whether the AJ improperly interpreted the protective order and its exceptions in evaluating specification three of the Conduct Unbecoming charge.

The Board held that "the protective order clearly and unambiguously set forth the applicable . . . no contact provisions," and concluded that the "[AJ] improperly interpreted the protective order and its exceptions in evaluating specification 3 and the conduct unbecoming charge." J.A. 52-53. In passing, the Board noted that even if the protective order were incorrectly interpreted to allow electronic communications related to childcare and counseling matters outside of the actual counseling sessions, 3,201 communications in violation of the protective order remained. The Board noted that the AJ's decision to credit Mr. Gonzalez's belief that the protective order contained implicit exceptions permitting his extensive communications with his wife was "not relevant to [its] assessment" of whether Mr. Gonzalez violated the protective order. J.A. 53. n.6. Likewise, the Board noted that excluding electronic communications initiated by Mrs. Gonzalez (which the agency argued against), from the remaining 3,201 communications, 1,472 communications still remained that violated the protective order.

The Board held that "the agency proved by preponderant evidence that [Mr. Gonzalez] violated the protective order more than 1,400 times *as charged*." J.A. 54 (emphasis added). Five thousand and twenty-five (5,025)—the number of violative communications charged—is more than the 1,472 communications that would have been in violation of the protective order under the AJ's incorrect analysis of the protective order. The Board's preponderant evidence

holding confirmed that it applied the protective order as written, not as assessed by the AJ, and held Mr. Gonzalez to the charge of 5,025 violating communications based on the agency's proof of 5,025 electronic communications between Mr. and Mrs. Gonzalez.

Having sustained the third specification of the Conduct Unbecoming charge, the Board found that the agency had proven Mr. Gonzalez's misconduct adversely affected the agency's trust and confidence in his job performance, and established the existence of a nexus between the proven misconduct and Mr. Gonzalez's ability to accomplish his duties satisfactorily. After review of the relevant *Douglas* factors, the Board determined that the reasonable penalty for Mr. Gonzalez's misconduct was the agency's chosen penalty of removal.

Mr. Gonzalez timely petitioned this court for review of the Board's Final Order. We have jurisdiction under 28 U.S.C. §1295(a)(9).

V

Our review of the Board's Final Order is governed by 5 U.S.C. §7703(c): we set aside findings or conclusions of the Board only if such findings or conclusions are "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." *Hansen v. Dep't of Homeland Sec.*, 911 F.3d 1362, 1366 (Fed. Cir. 2018).

When a case is decided by an AJ, the AJ's decision is "an initial (or recommended) decision." *Connolly v. Dep't of Justice*, 766 F.2d 507, 512 (Fed. Cir. 1985) (citing 5 C.F.R. § 1201.111). If the Board grants a petition for review of an AJ's initial decision, as happened in this case, the Board assumes plenary authority over the case, and "may affirm, reverse, remand, modify or vacate the [initial] decision . . . in whole or in part." *Id.* The Board is free to make its own

factual determinations, and may make its own witness credibility determinations, except in instances where an AJ based a credibility determination on witness demeanor. *See Haebe v. Dep't of Justice*, 288 F.3d 1288, 1301-02 (Fed. Cir. 2002). *Haebe* holds that witness demeanor credibility determinations by an AJ can be upset by the Board for sufficiently sound, record-based reasons. *Id.* Sufficiently sound reasons include circumstances when an AJ's findings are incomplete, inconsistent with the weight of the evidence, or do not reflect the record as a whole. *See Faucher v. Dep't of the Air Force*, 96 M.S.P.R. 203, 208 ¶ 8 (M.S.P.B. 2004); *Wallace v. Dep't of Com.*, 106 M.S.P.R. 23, 33-35 ¶ 14-16 (M.S.P.B. 2007); *see also Boyd v. Dep't of Lab.*, 561 F. App'x 973, 977 (Fed. Cir. 2014).

## VI

Mr. Gonzalez challenges the Board's determination that he violated the protective order and the Board's determinations on nexus and the reasonableness of the penalty.

Mr. Gonzalez accepts that the two amendments to the protective order made at his request only affected the physical stay-away distance during child pick-up and drop-off and contact while at counseling sessions, and that "unfortunately there was no corresponding modification of the no contact provision to allow communications between spouses for implementation of the allowed exceptions to the order." Pet'r's Br. at 18. Nonetheless, Mr. Gonzalez argues that, under *Haebe*, the Board was required to accept as true his testimony that implicit exceptions to the protective order existed that permitted all of the electronic communication alleged by the agency to have violated the protective order. Mr. Gonzalez thus contends that his demeanor-based credible factual testimony prevents the Board from independently interpreting the protective order as a matter of law. Mr. Gonzalez additionally contends that the Board "unilaterally administratively modified the order to allow some contact," and "impliedly conceded," "despite the

categorical bar to communications," that he was permitted to communicate with his wife for the purpose of implementing the permitted contact. *Id.* at 13. Further, Mr. Gonzalez asserts that the Board arbitrarily amended the protective order to allow only the communications that fell within the time zones for child pick-up and delivery and counseling, thereby failing to "credit" Mr. Gonzalez with child and counseling related communications that occurred outside the arbitrary time zone limitations. *Id.* at 21. Mr. Gonzalez finds it "peculiar" that the Board would "anchor its interpretation of the scope of the exceptions" in the plain text of the protective order (barring all communications outside of the explicitly stated exceptions), while at the same time modifying the protective order to permit some, but not all of, the 5,025 communications. *Id.* at 15, 28-29.

Overall, Mr. Gonzalez accepts that the "clear import of the plain text of the protective order regarding communications was that there was to be categorically no communication at all by [Mr.] Gonzalez with his spouse, despite the [stay-away] exceptions." *Id.* at 28-29. But this "dilemma" was cured, according to Mr. Gonzalez, because "the record shows that the agency, the AJ and the full Board understood that certain communications were necessarily *de facto* authorized to implement the exceptions," and "the full Board administratively amended the protective order to allow for contact when necessary to effect the exceptions." *Id.* at 29.

In addition to his challenge to the Board's finding that he violated the protective order, Mr. Gonzalez argues that the Board abused its discretion in finding a nexus between Mr. Gonzalez's misconduct and the efficiency of the service. In particular, he argues that the agency failed to show by a preponderance of the evidence that his misconduct interfered with or adversely affected the agency's mission. Finally, Mr. Gonzalez challenges the removal penalty as unreasonable.

VII

With regard to the Conduct Unbecoming charge, the question before this court is whether the Board erred in reversing the AJ to sustain the agency's specification that Mr. Gonzalez violated the protective order 5,025 times. The answer to that question depends on whether Mr. Gonzalez is correct in his view that the protective order should be construed to allow all communications related to picking up and dropping off his infant daughter and to the couple's marriage and spiritual counseling. If the plain language of the protective order governs, Mr. Gonzalez does not challenge the Board's conclusion that preponderant evidence supports the agency's third specification of the Conduct Unbecoming charge.

We turn first to Mr. Gonzalez's argument that his demeanor-based testimony that all communications with his spouse were in conformance with the stay-away exceptions to the protective order negates the authority of the Board to interpret the protective order to the contrary, as a legal matter, according to its plain meaning. Mr. Gonzalez thus challenges as error the Board's determination that Mr. Gonzalez's testimony about his understanding of the scope of the protective order is not relevant. *Haebe* clearly limits the authority of the Board to disagree with demeanor-based credibility fact findings by an AJ, but Mr. Gonzalez points to no authority that allows the testimony of a fact witness to negate the authority of the Board to interpret the scope of a legal document. Furthermore, the Board is permitted to disregard demeanor-based credible testimony for sufficiently sound record-based reasons. *See Haebe*, 288 F.3d at 1301-02. In this case, the record shows that Mr. Gonzalez's understanding of the scope of the protective order is inconsistent with the weight of the evidence and does not reflect the record as a whole.

Mr. Gonzalez accepts that his counsel missed the opportunity to amend the protective order to permit

communications reasonably necessary to facilitate care for the child and to engage in counseling, and that Judge Sanchez expressly emphasized the no communication (electronic, written, or telephonic) provision of the protective order. The record shows that the agency, contrary to Mr. Gonzalez's assertions, never agreed that the protective order contained implicit exceptions for communications related to childcare or counseling. The only evidence in the record about possible implicit exceptions for communications came from SA Jackson, who testified that in her personal view it would be "necessary and proper" for Mr. Gonzalez to have communications "as an incident of [these] exception[s]" to facilitate childcare and counseling. Hr'g Tr. at 159, *Gonzalez v. Dep't of Educ.,* Docket No. SF-0752-15-0541-I-1 (M.S.P.B. Aug. 26, 2015). But SA Jackson clarified that notwithstanding her personal view, the protective order did not permit any communications relating to childcare or counseling. SA Jackson also testified that the reason she identified communications falling within the times for child delivery and counseling in her QIG analysis was simply to test whether the volume of violating communications would "drop dramatically" if the potentially incidental communications were overlooked. *Id.* at 181. SA Jackson was not asked whether the agency agreed with her personal view that incidental exceptions to the physical stay-away provisions would be necessary. Further, the record shows that the agency consistently argued that all 5,025 communications violated the protective order, from the proposal to remove through all proceedings before the Board. Contrary to the allegations in Mr. Gonzalez's brief, there is no evidence in the record that the agency ever agreed with his personal view that the protective order allowed the charged communications. Rather, the record establishes, and Mr. Gonzalez concedes, that he failed to secure permission for incidental communications from Judge Sanchez. For the reasons stated above, *Haebe* does not stand in the way of the Board's authority to disagree

with the AJ's assessment of the scope of the protective order.

Next, Mr. Gonzalez is incorrect when he asserts that the Board itself amended the protective order by accepting an analysis of the protective order that permitted many of the 5,025 communications while arbitrarily not permitting others. The Board clearly rejected the AJ's interpretation of the protective order. Mr. Gonzalez's argument that the Board read the protective order by its plain meaning and also, contradictorily, administratively amended the protective order to permit a volume of otherwise impermissible communications, has no basis. The Board did not administratively amend the protective order and did not agree that any of the 5,025 communications fell outside the explicit terms of the protective order.

There is no basis in the record to find incidental exceptions to the existing terms of the protective order barring communications between Mr. and Mrs. Gonzalez, nor any reason to upset the Board's determination that the agency sustained the third specification of the Conduct Unbecoming charge.

## VIII

Mr. Gonzalez also challenges the Board's determination that the agency provided substantial evidence to prove by a preponderance that a nexus exists between the proved misconduct (violation of the protective order) and the efficiency of Mr. Gonzalez's service. To establish a nexus, "the agency must show by preponderant evidence that there is a nexus between the misconduct and the work of the agency, i.e., that the employee's misconduct is likely to have an adverse impact on the agency's performance of its functions." *Brown v. Dep't of the Navy*, 229 F.3d 1356,1358 (Fed. Cir. 2000) (citing *Mings v. Dept. of Justice*, 813 F.2d 384, 389-90 (Fed. Cir. 1987)). The test for nexus has specificity when the alleged misconduct occurs off duty, as happened in this case. Under *Kruger v. Dept. of Justice*, 32

M.S.P.R. 71, 74 (1987), nexus for off duty misconduct may be shown by (1) a rebuttable presumption in egregious circumstances based on the nature and gravity of the misconduct, (2) a showing by preponderant evidence that the misconduct adversely affects the appellant's or coworkers' job performance or the agency's trust and confidence in the appellant's job performance, or (3) a showing by preponderant evidence that the misconduct interfered with or adversely affected the agency's mission.

In this case, the question is whether the agency showed by preponderant evidence that Mr. Gonzalez's violation of the protective order affected the agency's trust and confidence in Mr. Gonzalez's ability to perform his duties. The deciding official, SA Forbort, stated at the beginning of her penalty analysis that:

> There is a nexus between the charged misconduct and your position as a Federal law enforcement officer. . . . You are expected to conduct yourself while on-duty and off-duty in a manner that does not bring disrepute to yourself or to the agency. . . . You hold a position of public trust; the public expects that you will be trustworthy and act with integrity at all times. *At the very least, the public expects that a person sworn to enforce the laws of the United States will also follow the law. . . .* Your unbecoming conduct . . . violate[s] one or more of the expectations of Federal law enforcement officers described above.

J.A. 79 (emphasis added). With regard specifically to whether violation of the protective order affected the agency's trust and confidence in Mr. Gonzalez's job performance, SA Forbort stated in support of her initial conclusion:

> Your failure to comply with a local judge's protective order for its entire duration violates the expectation that a person sworn to enforce the laws will also follow the law at all times. Your behavior calls into question your ability and willingness to follow lawful orders and legal requirements related to your assigned investigations. . . . Failing to notify your supervisor or me of your change of address after three notices of this requirement violates the basis expectation that you will follow management's instructions. . . .    I cannot be confident that you would . . . follow legal orders related to your investigations[.]

J.A. 80, 82. SA Forbort further stated that "I do not believe that management in OIG can confidently assign casework to you knowing that you engaged in unbecoming conduct, including violating a protective order." J.A. 83.

Because the AJ did not make a nexus finding regarding the specifications of charges that she did not sustain, the Board was required to make a nexus finding concerning the agency's proof on the third specification of the Unbecoming Charge. Mr. Gonzalez argues that the Board relied solely on the deciding official's decision, quoted above, which generally referred to all of the charged misconduct, without any detailed independent analysis of nexus related to his violation of the protective order. As such, Mr. Gonzalez challenges the nexus assessment as overbroad and thus legally insufficient. We disagree. The Board clearly provided details connecting nexus to the specific alleged misconduct of violation of the protective order. In particular, the Board's decision on nexus cited the agency's unwillingness to assign casework to Mr. Gonzalez because of his lack of respect for the law, as shown by his violation of the protective order on a regular basis during its entire duration. Mr. Gonzalez's assertion that "the Board failed to

properly parse the record" to establish a particular nexus between the purported violation of the protective order specification and the efficiency of the service is unsupported by the record. Pet'r's Br. at 33. Substantial evidence supports the Board's finding that the agency satisfied the nexus requirement with respect to the third specification of the Unbecoming Charge.

## IX

As a final matter, we consider Mr. Gonzalez's argument that the penalty of removal is unreasonable. SA Forbort testified that she would not consider a removal penalty if the only charge sustained was the Failure to Follow Instructions; but would still consider a removal penalty if any single specification sustained under the Conduct Unbecoming charge were sustained. The AJ only considered the penalty for the Failure to Follow Instructions charge, leaving the Board with the responsibility to assess the reasonableness of the removal penalty for Mr. Gonzalez's unbecoming conduct based on his violation of the protective order.

The reasonableness of a given penalty is measured by application of the factors set forth in *Douglas v. Veterans Admin.*, 5 M.S.P.B. 313 (1981). The twelve *Douglas* factors are:

> (1) The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated; (2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position; (3) the employee's past disciplinary record; (4) the employee's past work record,

including length of service, performance on the job, ability to get along with fellow workers, and dependability; (5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties; (6) consistency of the penalty with those imposed upon other employees for the same or similar offenses; (7) consistency of the penalty with any applicable agency table of penalties; (8) the notoriety of the offense or its impact upon the reputation of the agency; (9) the clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question; (10) potential for the employee's rehabilitation; (11) mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and (12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

*Id.* at 332. "[T]he penalty for employee misconduct is left to the sound discretion of the agency." *Miguel v. Dep't of the Army*, 727 F.2d 1081, 1083 (Fed. Cir. 1984). An agency and the Board need consider only the factors relevant to the particular circumstances and the individual at hand. *Nagel v. Dep't of Heath and Hum. Servs.*, 707 F.2d 1384, 1386 (Fed. Cir. 1983). The Board reviews whether the agency "conscientiously consider[ed] the relevant factors and did strike a responsible balance within tolerable limits of reasonableness." *Douglas*, 5 M.S.P.B. at 332–33. A

challenge to a penalty must show that the penalty itself is "totally unwarranted." *DeWitt v. Dep't of the Navy*, 747 F.2d 1442, 1445 (Fed. Cir. 1984).

In reviewing the penalty of removal, on factor (1) the Board considered foremost the nature and seriousness of the misconduct and its relation to the employee's duties, position and responsibilities. Citing *Hernandez v. Dep't of Agriculture*, 83 M.S.P.R. 371 ¶¶ 2, 9 (M.S.P.B. 1999), the Board identified the charges of Conduct Unbecoming and Failure to Follow Instructions as serious. Citing *Cantu v. Dep't of the Treasury*, 88 M.S.P.R. 253, 257 ¶ 8 (M.S.P.B. 2001), the Board noted that it has long imposed "a higher standard of conduct and degree of trust . . . [for] an incumbent of a position with law enforcement duties," such as Mr. Gonzalez. J.A. 57. Further, the Board credited SA Forbort's determination that "[a]t the very least, the public expects that a person sworn to enforce the laws of the United States will also follow the law." J.A. 57, 79. In addition, the Board noted Mr. Gonzalez's frequent violation of the protective order over a 4 month period, and the agency's determination that it could not maintain confidence in Mr. Gonzalez's ability to perform his law enforcement duties. The Board considered as mitigating factors "[Mr. Gonzalez's] 14 years of service with strong performance ratings and no prior discipline." J.A. 57. But for the Board, the mitigating factors did not outweigh the seriousness of the sustained charge, and it found the agency's chosen penalty of removal was reasonable.

An agency's chosen penalty may be overturned "when the agency failed to weigh the relevant factors, or . . . [its] judgment clearly exceeded the limits of reasonableness." *Douglas*, 5 M.S.P.B. at 333. In this case, Mr. Gonzalez argues that the Board, in approving the penalty of removal, erred in its analysis of *Douglas* factors 1, 4, 5, 8, and 10, and that due to those errors, a remand to the agency to reconsider the penalty is required.

On the first and fifth *Douglas* factors, Mr. Gonzalez argues that the Board's penalty analysis was infected by the agency's reliance on the unsustained charges. Mr. Gonzalez thus raises the question of whether the agency's assessment of these *Douglas* factors is sufficiently tied to violation of the protective order, the one specification that remained to support the Conduct Unbecoming charge. Mr. Gonzalez also argues that his violation of the protective order was "inadvertent and technical, [and] not malicious." Pet'r's Br. at 42. The record shows that the agency tied Mr. Gonzalez's violation of the protective order to its assessment of the seriousness of the offense and its impact on the agency's loss of confidence in Mr. Gonzalez's ability to perform his duties. SA Forbort stated, "[y]our failure to comply with a local judge's protective order for its entire duration violates the expectation that a person sworn to enforce the laws will also follow the law at all times. Your behavior calls into question your ability and willingness to follow lawful orders and legal requirements related to your assigned investigations." J.A. 80. SA Forbort also undermined Mr. Gonzalez's attempt to minimize his violations of the protective order, finding that Mr. Gonzalez was present when Judge Sanchez outlined the conditions of the protective order, and that nothing supported Mr. Gonzalez's broad interpretation of the order's exceptions. The record shows that Mr. Gonzalez cannot downplay his misconduct by describing it as inadvertent, technical, and not malicious. We perceive no error in the agency's application of the first and fifth *Douglas* factors to Mr. Gonzalez.

Mr. Gonzalez's contention regarding the fourth *Douglas* factor is unexplained, as the agency and the Board gave Mr. Gonzalez credit on this factor, noting his long service with strong performance and no previous discipline, as considerations favoring mitigation against the removal penalty.

On *Douglas* factor eight, notoriety, Mr. Gonzalez seeks mitigation here, as he did before the agency, due to the lack

of any media coverage of his case, which he reasons means there can be no adverse effect on the reputation of the agency. The agency responds that media coverage is not the only way an employee's misconduct can impact the agency's reputation. In fact, SA Forbort found that Mr. Gonzalez's actions harmed OIG's reputation among LASD members and the District Attorney's Office. Before this court, Mr. Gonzalez only faults the agency on factor eight due to the lack of publicity of his wrongdoing but does not disagree that an agency's reputation can otherwise be adversely affected by the alternative means cited by the agency in his case. Mr. Gonzalez has not established error in the agency's or the Board's application of the eighth *Douglas* factor.

Finally, on *Douglas* factor ten, rehabilitation, Mr. Gonzalez argues that his long and highly regarded service and lack of previous discipline, coupled with his good faith belief that he had not violated the protective order, should suffice to demonstrate that he is an excellent candidate for rehabilitation. However, the record shows that the agency assessed Mr. Gonzalez's likelihood for rehabilitation as low based on the seriousness of his misconduct. SA Forbort dismissed Mr. Gonzalez's attempt to excuse his violation of the protective order and failure to follow instructions as inadvertent, technical, or a mistake, and emphasized that this "minimize[d] [his] role in the misconduct," which is incompatible with his claims toward likely rehabilitation. J.A. 85. To the contrary, SA Forbort found Mr. Gonzalez's actions show that he "intentional[ly] and repeated[ly]" "disregarded the protective order on a regular basis." J.A. 81. Especially "[i]n light of [Mr. Gonzalez's] training and experience as a Federal law enforcement officer, not following an order legally imposed on [him] [was] not a technical violation." *Id.* Nothing in SA Forbort's rationale or conclusion evidences error.

Mr. Gonzalez fails to demonstrate any error in the agency's assessment of the relevant *Douglas* factors in

recommending and effecting his removal, or in the Board's review of the agency's assessment and conclusion that the agency's chosen penalty of removal is reasonable.

## CONCLUSION

For the reasons explained above, we find no reversible error in the Board's decision sustaining Mr. Gonzalez's removal from his position, and therefore we affirm the Board's Final Order.

## **AFFIRMED**

### COSTS

No costs.